# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF CALIFORNIA

**ANTHONY AVILEZ TRAMMELL**,

        Petitioner,

v.

**CLARK E. DUCART, Warden**,

        Respondent.

_____/

1:14-cv-00954-AWI-MJS

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY**

(Doc. #1)

Petitioner is a state prisoner proceeding *pro se* with a writ for habeas corpus pursuant to 28 U.S.C. §2254. Respondent is represented by Craig Meyers of the Office of the California Attorney General.

## I.  PROCEDURAL BACKGROUND

Petitioner is in the custody of the California Department of Corrections pursuant to the May 10, 2011, judgment of the California Superior Court, County of Merced. (Clerk's Tr. at 525-26.) A jury found Petitioner guilty of first degree murder, receiving stolen property, gang participation, brandishing a firearm to resist arrest and two counts of possession of a firearm by a felon. People v. Trammell, 2013 WL 3778295, at *1 (Cal. Ct. App. July 18, 2013). Petitioner was sentenced to a prison term of 22 years followed by a sentence of life in prison without the possibility of parole. Id. Petitioner filed a direct appeal with the California Court of Appeal, Fifth District. On July 18, 2013, the appellate court corrected sentencing errors and affirmed the judgment. Id. at *15. On August 27, 2013, Petitioner filed a petition for review in the California Supreme Court to exhaust his state remedies. (Lodged Doc. 17.) On October 2, 2013, the California Supreme Court denied the petition. (Lodged Doc. 18.)

1

Petitioner filed his federal habeas petition on May 19, 2014, alleging a single claim that statements a witness, Alex Uriostegui, made to police were erroneously admitted at trial in violation of Petitioner's due process rights. (ECF No. 1, p. 6, 24.) On October 2, 2014, Respondent filed an answer to the petition. (ECF No. 18.) Petitioner did not file a traverse, and the matter stands ready for adjudication.

## II.   <u>STATEMENT OF THE FACTS</u>[1]

*Facts of the Case*

On November 15, 2008, Lee Winzer's gray 1992 Chevrolet Lumina was stolen. The car was missing the trunk lock. On November 24, 2008, a Performance Towing and Transport truck was stolen. The truck was a white 1989 Chevrolet service truck with metal toolboxes affixed to the passenger side of the bed… Upon learning the truck was stolen, the owner of the business, Brian Thompson, informed his employees of the theft. He instructed his employees, including the victim, Randall Armendariz, to notify law enforcement if they located the vehicle.

That same night, defendant arrived at Alejandro Uriostegui's home. Uriostegui lived in a small converted storage shed behind his mother's house in Merced. A friend of Uriostegui's, Christine Smythe, was present at the house when defendant arrived. Uriostegui, who was a longtime friend of defendant, noted he arrived in a white service pickup truck that had toolboxes affixed to the bed. The truck was loud. Defendant was with another person, who was driving the truck, that Uriostegui did not know. During the visit, defendant sold Uriostegui some hand tools for $20 to $30. Uriostegui denied exchanging methamphetamine for the tools. Uriostegui did not know if defendant had a gun with him at the time. Uriostegui identified the truck as the Performance Towing and Transport truck that had been stolen.

…

While at Uriostegui's house, defendant talked to Uriostegui about being in a high-speed chase and "GTA'ing" over the weekend. "GTA" meant grand theft auto. Uriostegui gave defendant some methamphetamine, which he smoked. During the visit, defendant made a phone call and asked when "they" would come get him. Sometime later, the vehicle returned to the house, and defendant brought in a toolbox with tools that he and Uriostegui inspected. Uriostegui gave defendant some methamphetamine for the tools. Before leaving, defendant

---

[1] The Fifth District Court of Appeal's summary of the facts in its July 18, 2013 opinion is presumed correct. 28 U.S.C. § 2254(e)(1).

retrieved a revolver from under a couch and put it in his pocket. When defendant left, she heard the loud vehicle drive away.

Robert White was at his home in the vicinity of Carmel Road and Ruby Avenue in Merced that same evening. At about 10:30 p.m., White was in his driveway when he noticed two vehicles down the street that appeared to be drag racing. One was a pickup truck and the other was an SUV, possibly a Jeep. The SUV appeared to cut off the pickup in a cul-de-sac, and the two vehicles stopped. He saw two people running around, one chasing the other, and yelling angrily after the vehicles stopped. A few minutes later a dark colored midsize sedan pulled up behind the other two vehicles. Someone exited that car, walked around in front of the car, and then walked back. He then extended his arm and fired a shot. White did not see if anyone was hit by the shot as he went back into his home. He could not describe the shooter other than to say that it was a slender young male with short hair.

…

The victim, who was identified as Armendariz, was pronounced dead at the scene. He died from a gunshot wound to the forehead. The victim had been shot one time and there was no exit wound.

…

Uriostegui testified that he heard of the murder on the following day. He learned of the incident from some people who lived down the street from his home. Defendant was present at the time and part of the discussion; however, Uriostegui denied that defendant said anything to him about being involved in the murder or shooting the victim. Uriostegui also denied ever telling Merced police detective John Fister that defendant had admitted any part in the murder.

On November 26, 2008, Merced police officer Jobe Sandhagen, a member of the gang suppression unit, attempted to locate defendant for questioning in association with the murder. Officer Sandhagen was informed that defendant was a gang member and possibly armed with a handgun. The officer, along with another officer, began surveillance on Uriostegui's home and determined defendant was present at the home. Subsequently, a team of officers arrived to take defendant into custody.

Prior to entering the residence, Officer Sandhagen put on a blue tactical vest with the word "POLICE" on it. The officers approached the garage area in the back of the house and noticed the door was open but the doorway was covered by a curtain. There was an approximately two foot gap between the curtain and the ground, so the officer squatted down to peer inside the room. After seeing defendant inside the room, he began to pull the curtain back. He then saw defendant sitting or lying on a bed or couch holding a revolver pointed

3

directly at the officer's face. Seeing that the gun was at least partially loaded, Officer Sandhagen began firing at defendant while stepping backwards. Other officers began firing as well. Defendant did not fire his weapon. Officer Sandhagen did not recall if he announced his presence prior to the shooting, but other officers recalled hearing the announcement prior to the gunshots. Defendant suffered numerous gunshot wounds and was transported to the hospital by ambulance.

…

Detective Fister testified that he, along with Detective Chris Russell, interviewed Uriostegui on November 26, 2008. The interview was videotaped and was played for the jury. In the recorded interview, Uriostegui initially denied defendant had said anything to him about a murder. However, Uriostegui ultimately admitted defendant had told him about the murder the day after it occurred. He stated defendant told him someone had a stolen "RTS" truck and defendant was in a stolen car and somehow they "bumped heads" with the victim. Defendant said he was there with two friends when the victim "tried to run up" on defendant's friend and "that's what happened." When Detective Fister asked if defendant walked up and shot at that point, Uriostegui nodded. Upon further questioning, Uriostegui stated that defendant was behind the truck and they stopped and the victim "started talking shit" to them and was "walking up on his homeboy" and defendant was right behind the victim and shot him. Defendant then said they just got into the car and left.

Uriostegui stated he had not believed defendant's story and thought he was just trying to show off. Uriostegui did not believe what defendant told him because defendant said the truck he arrived in on Monday was the same truck involved in the murder, but he described it as an "RTS" truck.

During his trial testimony, Uriostegui denied that defendant ever told him anything about a murder or that he ever admitted killing someone over a truck. Uriostegui also denied ever making those statements to Detective Fister. Uriostegui testified that he "hung around" Norteño gang members in November of 2008. According to Smythe, she knew Uriostegui to affiliate with the "NFL," Norteño For Life, gang. During that time frame, Norteño gang members would come to his house and use methamphetamine. Uriostegui admitted during the taped interview that he was a Norteño For Life gang member "from the heart."

…

*Uriostegui's Interview*

After the shooting at Uriostegui's home, Uriostegui was taken into custody. That evening, he was interviewed by Detectives Fister and Russell. The interview began with the detectives informing Uriostegui defendant was out of

surgery and in stable condition. They also informed Uriostegui the rest of his family had been interviewed and released, they were still processing the house, and they had found some methamphetamine, his identification, a gun, and some gang indicia in the small house in the back. The detectives told Uriostegui they just wanted the truth from him, and as long as he told the truth "we're probably not gonna have any problems, okay? Anything we found in the house can be worked out because we're here ... after a bigger squirrel, okay? I'm not worried about charging you with the gun. Uh, if need be then, you know, so be it. Um, but I would rather just get the truth from ya. Um, I'm not asking you to snitch nobody off, okay?"

Before going any further into the interview, Detective Fister read Uriostegui his Miranda rights. Next, the detective questioned Uriostegui about what he saw before the shooting with the police. Then the interview progressed to questions involving when Uriostegui last saw defendant before the police shooting. Uriostegui explained he had seen defendant daily for the preceding three days. He also explained he had previously seen defendant with a gun and described it for the detectives. They discussed what time Uriostegui saw defendant on Monday night, who was there, and how defendant arrived. Uriostegui said defendant arrived in a white landscaping or maintenance truck with toolboxes affixed to the side of the truck. Defendant was with two other men.

Uriostegui mentioned defendant sold him some tools that night and described them as well as what kind of toolbox they were in. He continued to answer questions about defendant, the next time he saw him after Monday, and the circumstances of that visit. The detectives confronted Uriostegui, asking if defendant told him what happened on Monday night but Uriostegui denied knowing anything. Uriostegui then admitted he had heard of a shooting occurring on Monday night, claiming he just heard about it from people on the street.

Detective Russell informed Uriostegui he thought he was being honest with them and began confronting Uriostegui with the facts they knew at the time. Detective Fister noted Uriostegui was being "pretty truthful" although he appeared to be answering the questions "very carefully." He explained how they were investigating a homicide and how the facts they had at the time suggested Uriostegui was facilitating defendant in the homicide in some manner. Russell explained that assisting someone after a homicide could result in him going "to prison for a very long time." He explained defendant had been caught in Uriostegui's home just days after a murder, with a gun the detectives believed would prove to be the murder weapon. In addition, defendant had arrived in a stolen truck that the shooting victim had been looking for, and Uriostegui had bought tools from that truck. The detectives explained Uriostegui had things going for him in his life, while it appeared defendant was going to go to prison for the rest of his life.

Detective Russell noted "the problem here is this is a gang-related offense, mm-kay? Uh, you have a past history, you know? There's indicia in your house. There's a gun in your house. And you're—I'm just talking about you now, okay? And facilitating this cry—this—this homicide, you might be looking at at least 10 years for the gun." He then clarified that was with the gang enhancement and for a loaded gun. He continued, "And now I think it's time to come clean and be honest and alleviate yourself. Because you can either be a witness or a suspect. It's as simple as that." Defendant, they explained, had already made his choice. The discussion digressed to whether defendant had told Uriostegui about stealing cars the previous weekend, and Uriostegui acknowledged that he had.

The detectives came back to the situation at hand, explaining this would be the only opportunity Uriostegui would have to talk to them, and that "unfortunately your—your path got crossed. And we found stuff there. And we knew that [defendant] was at your house. And we knew he's been at your house. Um, and the fact of the matter is, I mean you got caught up." Detective Fister explained, "But as long as you tell the truth, 'cause I—I feel you're holding back stuff uh, there's no reason you shouldn't go home tonight. But I don't feel you're being totally truthful. I've been doing this 34 years. Um, there's some things you're holding back that are important to us in the investigation. And I—and we need that. To be upfront with ya, we don't need it to prosecute [defendant]."

Detective Fister clarified:

"And I'm not saying the stuff, the files might not be charged, you know, with the DA's office or with paper or whatever but uh, if I leave here—and correct me if I'm wrong 'cause we're in this together uh, I can't justify, in my mind, with what's happened if you're not being truthful that you just, you know, just shouldn't be arrested for the dope and the gun and everything else, okay? And I'm just being forthright with you, bud. I'm not uh, cutting any corners. And correct me if I'm wrong. I mean I don't—I'll have to clare [*sic*] it with the sarge. But uh, I just don't feel you're being totally upfront with what you know."

The detectives explained Uriostegui did not need to worry that his statement would incriminate him if he was not present at the scene of the murder and did not commit the murder. Under that situation, he "should be free gratis." At that point, Uriostegui stated defendant brags about "everything" but he did not say anything about a murder, and before the police arrived that day, Uriostegui told defendant he needed to be careful who he talked to as there was always someone watching.

Detective Fister responded:

"Well there's something you're not telling us though, Alex. And I—and I just would like to know what it is. I've been doing this too long not to—not to realize when somebody's, you know, you're telling the truth mostly. But you're

6

leaving stuff out. And I just want to know about the stuff you're leaving out 'cause it must be important to you, okay? Otherwise you wouldn't be so upset. And I'd just like to know what that is. You want me to turn the recorder off?"

Uriostegui replied, "I'm scared. I'm scared of that." The detectives explained he was "between a rock and a hard spot" but he had to decide what was more important to him, spending time "behind bars for quite some—quite some time for a guy who didn't think twice to come over to your house and involve you in this or, you know, having a life with a—a family on this side of the the—the—the fence. And uh, and—and being free." After being told that prison "ain't the place to be," Uriostegui stated defendant might have mentioned something to him. Uriostegui told the detectives defendant had said something to the effect of someone had stolen an "RTS" truck and defendant was in a stolen car, and somehow defendant had "bumped heads" with the victim. Uriostegui claimed he did not believe defendant, that he was just bragging. He continued saying defendant was with two friends and the victim had "tried to run up on his friend. And that's what happened." When Detective Russell asked if defendant shot the victim, Uriostegui nodded. Additionally, when asked if defendant bragged about it, Uriostegui replied "the way it sounded to me was like he was trying to show off."

Detective Fister then asked Uriostegui for details on what exactly defendant said regarding how he walked up to the victim and whether the victim confronted defendant with any weapons. Fister reiterated they wanted to give the victim's family some closure by telling them what happened, and he stated Uriostegui's name did not have to come up. Uriostegui questioned this and the detectives explained his name would be in the report regardless of what happened. Uriostegui motioned toward the digital recorder, and Detective Fister told him that if it would make Uriostegui feel better he would turn it off, but they still had to document the conversation "word by word." After he was told the recorder was off, Uriostegui asked, "So you guys gonna pay my ... ticket out of Merced too?" and Detective Russell replied, "If need be, we can help ya out, absolutely." At that point Uriostegui provided additional details regarding defendant's statement.

He stated defendant was behind the truck and they stopped and the victim "started talking shit" to them and was "walking up on his homeboy" and defendant was right behind the victim and shot him. Defendant then said they just got into the car and left. Uriostegui stated he did not believe defendant's story and thought he was just trying to show off. Uriostegui did not believe what defendant told him because defendant had told Uriostegui the truck he arrived in on Monday was the same truck that was involved in the murder, but he described it as an "RTS" truck.

People v. Trammell, 2013 WL 3778295, at *2-8 (Cal. Ct. App. July 18, 2013).

### III.   GOVERNING LAW

**A.  Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Merced County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a).  Accordingly, the Court has jurisdiction over the action.

**B.  Legal Standard of Review**

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997).  The instant petition was filed after the enactment of AEDPA; thus, it is governed by its provisions.

Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n. 7 (2000).  Federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

/ / /

/ / /

1    1.  <u>Contrary to or an Unreasonable Application of Federal Law</u>

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005) citing <u>Williams</u>, 529 U.S. at 405-06.  "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statute recognizes . . . that even a general standard may be applied in an unreasonable manner." <u>Panetti v. Quarterman</u>, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" <u>Musladin v. Lamarque</u>, 555 F.3d 830, 839 (9th Cir. 2009).  Governing legal principles set forth by the Supreme Court at the time a state court renders its decision constitute "clearly established Federal law." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71-72 (2003).  A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." <u>Id.</u> at 75-76, quoting <u>Williams</u>, 529 U.S. at 409-10; <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25 (2002).  In <u>Harrington</u>, the Court further stresses that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (citing <u>Williams</u>, 529 U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Id.</u> (citing <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)).  Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations." <u>Id.</u>; <u>Renico v. Lett</u>, 559 U.S. 766, 776 (2010).  "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 122 (2009), quoted by <u>Richter</u>, 559 U.S. at 101.

/ / /

/ / /

2.  <u>Review of State Decisions</u>

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991).  This is referred to as the "look through" presumption.  <u>Id.</u> at 804; <u>Plascencia v. Alameida</u>, 467 F.3d 1190, 1198 (9th Cir. 2006). Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion, "does not require that there be an opinion from the state court explaining the state court's reasoning."  <u>Richter</u>, 559 U.S. at 100.  "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  <u>Id.</u> at 98. ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

<u>Richter</u> instructs that whether the state court decision is reasoned and explained, or merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  <u>Id.</u> at 102.  Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  <u>Id.</u> (citing <u>Lockyer v. Andrade</u>, 538 U.S. at 75).  AEDPA "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents."  <u>Id.</u>  To put it yet another way:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

1  Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts are the

2  principal forum for asserting constitutional challenges to state convictions."  Id. at 787.  It

3  follows from this consideration that § 2254(d) "complements the exhaustion requirement and the

4  doctrine of procedural bar to ensure that state proceedings are the central process, not just a

5  preliminary step for later federal habeas proceedings."  Id. (citing Wainwright v. Sykes, 433 U.S.

6  72, 90 (1977)).

7  **IV.   REVIEW OF PETITION**

8      Petitioner claims the trial court erroneously admitted Uriostegui's statements to the police.

9  Petitioner claims Uriostegui's statements were coerced and their admission at trial violated his

10  due process rights. (ECF No. 1, p. 24.) According to Petitioner, Uriostegui's comments, which

11  implicated Petitioner in the murder, were involuntary and a product of coercion. (ECF No. 1, p.

12  39-40.) Petitioner further claims the coerced statements do not constitute a harmless error. (ECF

13  No. 1, p. 40-43.) Respondent argues habeas relief is not available to Petitioner because there is

14  no clearly established federal law addressing whether admission of prejudicial evidence

15  constitutes a due process violation. (ECF No. 18, p. 23-24.) Respondent argues that because

16  there is no clearly established federal law concerning this issue, the state court's decision was not

17  an unreasonable application of, or contrary to clearly established federal law. (ECF No. 18, p.

18  24.)

19    *1.  State Court Decision*

20      Petitioner first presented this claim in his direct appeal to the California Court of Appeal,

21  Fifth Appellate District. The appellate court denied petitioner's claim in a reasoned decision.

22  Petitioner appealed to the California Supreme Court. The Supreme Court summarily denied

23  petitioner's claims. Because the California Supreme Court's opinion is summary in nature, this

24  Court "looks through" that decision and presumes the court adopted the reasoning of the

25  appellate court, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker,

26  501 U.S. 797, 803-04 & n.3 (1991)(establishing, on habeas review, "look through" presumption

27

28

that higher court agrees with lower court's reasoning where former affirms latter without

discussion). In denying Petitioner's claim, the appellate court explained:

> A thorough review of both the videotaped interview and its transcript reveals Uriostegui was simply confronted with the realities of his situation… As to the claim the officers threatened Uriostegui with prosecution, we find the tactics employed here were proper.
>
> …
>
> In addition, we note the detectives did not use any deception in explaining the situation, a fact defendant seems to acknowledge. The mere fact of explaining the situation to Uriostegui cannot be deemed coercive. Uriostegui was never told he must make a specific statement to avoid liability for a possible accessory charge. Rather, the detectives repeatedly told Uriostegui to tell the truth. Indeed, throughout the interview, they explained they believed he was being truthful; however, they also told him they felt he was holding back information. The discussions regarding the possible consequences he would face as an accessory merely explained that the detectives needed all the information before deciding whether he was an accessory to the murder. Thus, informing Uriostegui he was either a witness or a suspect was not itself coercive.
>
> …
>
> Here the totality of the circumstances supports a finding Uriostegui's statement was voluntary. First we note there was nothing heavy-handed about the interview. The detectives provided Uriostegui with his *Miranda* rights prior to the interview. They never raised their voices or put any undue pressure on Uriostegui. They did not use any deceptive practices.
>
> Second, Uriostegui did not appear particularly fragile or unduly susceptible to coercion. Although Uriostegui had been detained for approximately nine hours, it does not appear he was particularly tired or uncomfortable in the tape recording. In fact, the detectives noted during the interview that they had provided him with a meal and water. Before beginning the interview, the detectives informed Uriostegui of defendant's condition. Further, they explained Uriostegui's family members had already been interviewed and released and had places to stay for the evening while the police were still processing the house.
>
> Third, Uriostegui was no stranger to the criminal justice system, noting himself he had previously been "locked up" before. Further, he admitted he was an entrenched gang member. He did not appear to have a fragile mental state during the interview.

Finally, there was no evidence in this case Uriostegui felt coerced or that his statement was involuntary. Uriostegui never made any statements to the effect he felt pressured to make a statement, nor did he testify his statement was anything but voluntary. At trial he simply denied ever telling the detectives defendant admitted the shooting, and he claimed he did not recall what statements he made during the interview. He claimed defendant never confessed the shooting to him. Considering the totality of the circumstances, we do not find his statement was involuntary or coerced. Defendant argues that in addition to threats, Uriostegui was also given promises of leniency in exchange for his statement. Initially, we note the detectives never promised charges would not be filed in the case if Uriostegui made a statement. With regard to the statements about the gun and narcotics found in Uriostegui's home, the detectives only stated that as "long as you're telling the truth, we're *probably* not gonna have any problems." (Italics added.) While the detective stated something could be "worked out," he did not suggest there would be no prosecution whatsoever. Indeed, he later stated he was "not saying ... the files might not be charged ... with the DA's office."

…

We have watched and listened to the recording and note the tone used could hardly be considered threatening, forceful or coercive. Consequently, under the totality of the circumstances, we are persuaded the statement was voluntarily given, and the use of the statement did not violate defendant's right to due process.

(Lodged Doc. 16.)

*2. Legal Standard*

"The starting point for cases subject to § 2254(d)(1) is to identify the 'clearly established Federal law, as determined by the Supreme Court of the United States' that governs the habeas petitioner's claims." Marshall v. Rodgers, --- U.S. ----, 133 S. Ct. 1446, 1449 (2013). If no Supreme Court holdings address the question presented, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.' " Carey v. Musladin, 549 U.S. 70, 77 (2006)(quoting § 2254(d)(1)). Declining to apply a specific legal rule that has not been squarely established by the Supreme Court, does not amount to an unreasonable application of clearly established Federal law by a state court. Harrington v. Richter, 562 U.S. 86, 101 (2011)(quoting Knowles v. Mirzayance, 556 U.S. 111, 122 (2009)). Under Section 2254(d)(1), relief is only available "if, and only if, it is so obvious that a clearly established rule applies to a given set of

1   facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, ---

2   U.S. ----, 134 S. Ct. 1697, 1706-07 (2014).

3     *3. Discussion*

4       The specific question presented in this case is whether admission of coerced witness

5   testimony violates Petitioner's due process rights. The Supreme Court has not addressed this

6   question. Although the Supreme Court has clearly established that a defendant's own coerced

7   confession cannot be used against him, the Court has not addressed the issue presented here.

8       In <u>Payne</u> the Supreme Court declared that a petitioner's coerced confession could not be

9   used before a jury over the petitioner's objection because it violated the petitioner's

10   constitutional rights. <u>Payne v. State of Ark.</u>, 356 U.S. 560, 567 (1958). In <u>Jackson</u> the Court

11   found that a conviction based on a defendant's involuntary confession, "without regard for the

12   truth or falsity of the confession," deprived the defendant of his Fourteenth Amendment rights.

13   <u>Jackson v. Denno</u>, 378 U.S. 368, 376 (1964). Later, the Supreme Court explained that its

14   decision in <u>Jackson</u> was "designed to safeguard the right of an individual…not to be compelled

15   to condemn himself by his own utterances." <u>Lego v. Twomey</u>, 404 U.S. 477, 485 (1972). Use of

16   a defendant's coerced confession to a psychiatrist, who was the paid representative of the state at

17   the time of the confession, was found to violate the defendant's due process rights in <u>Leyra</u>.

18   <u>Leyra v. Denno</u>, 347 U.S. 556, 559-561 (1954).

19       The Supreme Court has clearly established that a defendant's coerced testimony cannot be

20   used against him at trial. No Supreme Court case addresses the issue of whether coerced witness

21   testimony can be used against a defendant at trial. In all the cases cited above, the defendants

22   argued that their confession to a crime had been coerced by state actors. Here, Petitioner is

23   arguing that statements made by a witness, implicating him in a murder, were coerced. It is not

24   clearly obvious that the rules established in the cases above would apply to Petitioner's claim.

25   Those cases are concerned with a defendant being forced to condemn himself. Since no Supreme

26   Court case addresses the specific question presented, there is no clearly established federal law

27   that the state court decision could be contrary to or an unreasonable application of.

28

1     Further, assuming the videotape of Uriostegui was erroneously admitted it is not clear that

2  admission of the tape would constitute a due process violation entitling Petitioner to habeas

3  relief. The Ninth Circuit concluded that a petitioner was not entitled to habeas relief because the

4  Supreme Court has not made "a clear ruling that admission of irrelevant or overtly prejudicial

5  evidence constitutes a due process violation sufficient to warrant issuance of the writ." Holley v.

6  Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009). Estelle addressed the question of whether

7  admission of prior injury evidence, used to prove battered child syndrome, violated the

8  defendant's constitutional rights. Estelle v. McGuire, 502 U.S. 62, 68 (1991). The Supreme

9  Court concluded that the evidence was relevant to the case and therefore it did not need to

10 address whether admission of irrelevant evidence in a criminal trial violated the defendant's due

11 process rights. Id. at 71. Therefore, Petitioner is not entitled to habeas relief because there is no

12 clearly established federal law addressing when admission of evidence results in a due process

13 violation.

14    Even if Petitioner could challenge the admission of coerced witness testimony, habeas relief

15 would still not be available because the state court reasonably concluded that Uriostegui's

16 statements to the police were not coerced. A confession is coerced if the "defendant's will was

17 overborne" at the time he confessed. Dickerson v. United States, 530 U.S. 428, 434 (2000). To

18 determine whether the defendant's will was overborne, the totality of the circumstances

19 surrounding the giving of a confession must be taken into account. Id. Under this test,

20 Uriostegui's statements were not coerced.

21    During the interrogation Uriostegui was informed of his Miranda rights. (Clerk's Tr. at 418,

22 line 182.) He had been also given food and water. (Clerk's Tr. at 436, line 994.) The officers

23 informed Uriostegui that if he assisted Petitioner in any way with the homicide he could go to

24 prison for a very long time. (Clerk's Tr. at 437, line 1063.) This statement does not constitute a

25 threat, rather it informs Uriostegui that there is a possibility he could go to prison. Throughout

26 the interrogation the officers repeatedly told Uriostegui they were only interested in the truth.

27 (Clerk's Tr. at 416, 423, 441, 443.) The officers did not threaten Uriostegui or make any

28

1   promises of leniency. The officers told Uriostegui "we're not here to roust ya, bud. We're here to

2   get the information we need for the investigation." (Clerk's Tr. at 449, line 1577.) Uriostegui

3   seemed to be supplying answers willingly. The state court's conclusion that Uriostegui's

4   statements were not coerced was not an unreasonable determination of the facts in light of the

5   evidence presented. In addition, Uriostegui testified at trial where defense counsel had the

6   opportunity to cross-examine him. (Rep. Tr. at 712, 826.) Petitioner has not shown that the

7   California Court of Appeal decision denying his claim was contrary to clearly established

8   Supreme Court precedent or an unreasonable determination of the facts in light of the evidence.

9                                    **V.    CONCLUSION**

10      Petitioner is not entitled to relief with regard to the claim presented in the instant petition.

11   Therefore, the petition will be denied.

12                        **VI.    CERTIFICATE OF APPEALABILITY**

13      A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

14   district court's denial of his petition, and an appeal is only allowed in certain circumstances.

15   Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining

16   whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

17
18          (a) In a habeas corpus proceeding or a proceeding under section 2255 before a
            district judge, the final order shall be subject to review, on appeal, by the court of
19          appeals for the circuit in which the proceeding is held.

20          (b) There shall be no right of appeal from a final order in a proceeding to test the
21          validity of a warrant to remove to another district or place for commitment or
            trial a person charged with a criminal offense against the United States, or to test
22          the validity of such person's detention pending removal proceedings.

23
            (c)      (1) Unless a circuit justice or judge issues a certificate of appealability, an
24          appeal may not be taken to the court of appeals from–

25
                     (A) the final order in a habeas corpus proceeding in
26                   which the detention complained of arises out of
27                   process issued by a State court; or

28
                                              16

      (B) the final order in a proceeding under section
2255.

      (2) A certificate of appealability may issue under paragraph (1)
only if the applicant has made a substantial showing of the denial
of a constitutional right.

      (3) The certificate of appealability under paragraph (1) shall
indicate which specific issue or issues satisfy the showing
required by paragraph (2).

      If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

      In the present case, the Court finds that no reasonable jurist would find the Court's determination that Petitioner is not entitled to federal habeas corpus relief wrong or debatable, nor would a reasonable jurist find Petitioner deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

## VII.   **ORDER**

Accordingly, IT IS HEREBY ORDERED:

    1)  The petition for writ of habeas corpus is DENIED;

    2)  The Clerk of Court is DIRECTED to enter judgment and close the case; and

    3)  The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   July 23, 2015         _____

                                   SENIOR DISTRICT JUDGE

17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

18